UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-CR-80022-CANNON/REINHART

UNITED STATES OF AMERICA,

v.

JOHN PAUL GOSNEY, JR., et al.
_____/

**MOTION TO DISMISS FRAUD AND MONEY
LAUNDERING COUNTS OF THE INDICTMENT**

The Defendant, John Paul Gosney, Jr., through undersigned counsel, moves this Court to Dismiss Counts 1, 4-6, 14, 15, 17, and 19 of the Indictment, DE#23, as to John Paul Gosney, Jr. ("Gosney"), based on a flawed theory of prosecution, and in support states the following:

BACKGROUND

**A. The Criminal Complaint**

On February 7, 2022, a criminal complaint was filed under seal in the United States District Court for the Southern District of Florida against Michael and Galina Rozenberg, alleging conspiracy to commit health care fraud and conspiracy to commit money laundering. DE#1. The prosecution's health care fraud theory was that Medicare paid millions of dollars to have the Rozenbergs administer thousands of medically unnecessary cardiovascular genetic tests.

According to the sealed complaint, the "cardio tests" at issue "use DNA sequencing to detect mutations in genes that can indicate an increased risk of developing serious cardiovascular conditions in the future and can assist in the treatment or management of a patient who presently has signs or symptoms of a cardiovascular disease or condition." DE#1:7. "Medicare only covers such tests in

1

limited circumstances … to screen for genetic mutations." DE#1:8. Using a cheek or nasal swab containing DNA material provided by the patient, a lab then runs tests on different "panels" of genes. DE#1:7.

The sealed complaint alleged that the Rozenbergs and others, including Gosney, operated a telemarketing call center that would call Medicare beneficiaries (patients) to convince them to take the cardio test, potentially paid for by Medicare, if the patient was deemed and certified eligible by his own primary care physician ("PCP"). DE#1:17 and n.3. The telemarketers were provided "a binder containing information about the cardio testing and scripts to make telemarketing calls to the Medicare beneficiaries in an effort to 'sell' them cardio tests." DE#1:18. According to the sealed complaint, the sales pitch contained misrepresentations: the telemarketer would (inaccurately) identify himself as calling from "the health and wellness center" and tell the patient that they "spoke last year and we did a brief wellness check." DE#1:18. Once the patient expressed interest in what the telemarketer described as a "preventive [sic] test," the so-called "doctor chase" department was responsible for faxing prescriptions (requisition forms) for the cardio tests to beneficiaries' own doctors, seeking the doctors' authorization for the tests. DE#1:16-19. The sealed complaint alleged that at least one such "fax falsely and deceptively refers to the beneficiary as 'our mutual patient.'" DE#1:21.

According to Medicare data, over the six months of its operation, Progenix Lab received $25,640,384 from Medicare for cardio testing related to approximately 3,658 beneficiaries. DE#1:15-16. "Additionally, Medicare data reflects that [Progenix Lab] referenced all these expensive genetic tests out to a reference lab

located in California," DE#1:16, to whom Progenix Lab paid a few hundred dollars for each test.[1] DE#1:12.

### B. The Preindictment, Preliminary Hearing

On February 22, 2022, U.S. Magistrate Judge Chris McAliley conducted the preliminary hearing of Michael Rozenberg. Referencing the sealed complaint, the Government proffered that Rozenberg and others (unnamed but later indicted, including Gosney), through several allegedly related entities, defrauded Medicare of millions of dollars by administering medically unnecessary cardio tests. But the testimony of Health and Human Services ("HHS") Agent Brian Frank belied the government's theory.

Agent Frank admitted that each of these tests was actually performed. DE#170:72. For each proposed cardio test, a fax would be sent to the primary care physician ("PCP") containing information about the "patient's personal family history of cardiac conditions." DE#170:74. The purpose of the fax was to have the patient's PCP "look at the request, and in the ordinary course a doctor would look at his own records for this individual patient," and decide whether to order the test, DE#170:74, in which case the physician would sign the requisition form. DE#170:68.

Progenix Lab did not pay anything of value (*i.e.*, no kickbacks) to the authorizing physicians, and the physicians did not bill Medicare for evaluating their

---

[1] The complaint (DE#1:8-9) cites the so-called "Shell Lab Rule," which limits to 30 percent the number of tests that a lab can reference out to other labs "during the year in which the test is performed." 42 U.S.C. § 1395l(h)(5)(A)(ii)(III). But, as the complaint concedes, Medicare data reflects that Medicare knew that it was paying Progenix Lab for tests that Progenix Lab was referencing out to other labs to perform. DE#1:15-16. And defendants operated Progenix Lab for less than one year before it ceased doing business, so the defendants could not yet have violated the Shell Lab Rule's 30 percent yearly limit.

patients for medical necessity or ordering the tests. DE#170:71-72. None of the PCPs who authorized the cardio tests were complicit in any fraud or misrepresentations. DE#170:42.

The "scheme" thus depended upon thousands of independent, unpaid physicians, with access to their own patients' respective medical charts and information, reviewing the requisition and making a medical determination whether the patient was an appropriate candidate for the cardio test. DE#170:69-70. Physicians routinely declined to order the cardio test for their patients. DE#170:42 ("[T]he doctor chase department would send out up to 250 of these faxes a day and maybe 50 of them would come back.").

Of the more than 3,500 doctors who ordered a test for their respective patients, DE#170:71, the Government "interviewed a handful of them who have said I was under the impression the patient wanted it, but then the patient is saying, wait, I was told my doctor ordered it." DE#170:42. But the Government presented no evidence that the "[h]andful, six seven" doctors that the Government spoke to—or the thousands of others who ordered the tests for their patients—failed to perform their independent assessment of the medical necessity of the cardiovascular tests administered and paid for by Medicare. DE#170:71-72. Of the near 3,700 tests performed, Agent Frank had only heard complaints about the veracity of the doctor or patient signatures for "roughly ten, maybe more." DE#170:99-100. Two call center employees admitted to altering or forging doctors' signatures on lab requisition forms, neither of whom implicated Gosney in that misconduct. DE#170:43.

### C. The Indictment

Two days after Michael Rozenberg's preliminary hearing, on February 24, 2022, a multi-count indictment was returned against the Rozenbergs, Gosney and seven others. Gosney's involvement was based upon his allegedly undisclosed

beneficial ownership in three testing laboratories—Progenix Lab, Cergena Laboratories, and TheraGene Diagnostics, DE#23:11 (¶41)—to which Medicare paid $52 million. DE#23:15-17 (¶¶10-17).

The indictment alleges a Medicare health care fraud conspiracy (in violation of 18 U.S.C. §§ 1347, 1349) to provide medically unnecessary diagnostic testing and durable medical equipment to an unidentified number of patients. DE#23:16-17. The indictment acknowledges that Medicare requires physician certifications of medical necessity as a precondition to payment. DE#23:3 (describing required certifications of authenticity, Medicare compliance, and medical necessity of services actually performed). The indictment does not allege any physician failure to satisfy any of these requirements, including the certification of medical necessity for services actually performed.

Instead of challenging any of the physicians' medical necessity certifications, the indictment offers general medical observations on when testing or equipment might, or might not, be justified. DE#23:5-7 (¶¶13-19, 21-25). The indictment does not connect these hypothetical medical observations to any individual patient, patient demographic, reimbursement, or physician practice or certification.

The indictment alleges that certain named defendants—*not* including Gosney—"altered, forged, or back dated doctors' orders, or caused such doctors' orders to be altered, forged or backdated, for DME and genetic testing." DE#23:15 (¶7). The indictment does not quantify how many doctors' orders were forged, how much Medicare paid for testing tainted by forged orders, which of the related entities received the proceeds allegedly derived from forged orders or how much, if any, of those proceeds were received by Gosney.

The indictment lists five specific reimbursed medical services (Counts 2 through 6) as health care fraud. Of the health care fraud counts, Gosney is only

5

charged with Counts 4-6, which involve three cardio tests.[2] These three Gosney counts total $27,004 in reimbursements. DE#23:20 (counts 4-6). Gosney is also named in several related counts alleging kickbacks for testing referrals, 42 U.S.C. § 1320-7b(b) (counts 7, 10, 13), and money laundering, 18 U.S.C. § 1956 (counts 15, 17, 19).

Other than the three aforementioned cardio tests, the indictment only connects Gosney personally to testing through an alleged $16,600 kickback receipt from Company A "through Metropolis Account 1, which constituted a kickback payment for Medicare beneficiary referrals,"[3] and a $75,000 wire transfer from "Company B" to "Company A." DE#23:26 (count 10).

In addition to exposing Gosney to lengthy terms of imprisonment (as much as 20 years per count), the indictment also seeks forfeiture of health care fraud proceeds under 18 U.S.C. § 982(a)(7), fraud proceeds under 18 U.S.C. § 981(a)(1)(C), and money laundering forfeiture under 18 U.S.C. § 982(a)(1). DE#23:30-32.

On March 2, 2022, the Government filed an *Ex Parte* Application for a Post-Indictment Protective Order "to restrain and enjoin all funds on deposit in account number 42615348 at Valley Bank, held in the name of Metropolis Unlimited, LLC (the 'Subject Account')." DE#80:3. In a supporting declaration, FBI Special Agent Williams stated that Gosney is the sole member of Metropolis; that "there is probable cause to believe that the Subject Asset is subject to forfeiture, pursuant to 18 U.S.C.

---

[2] The health care fraud counts involving cardio tests are against all ten defendants for, among other things, "submitting and causing the submissions, via interstate wire communication, of false and fraudulent claims to Medicare for either DME or genetic testing that was not medically necessary and not eligible for Medicare reimbursement." DE#23:18-19 (¶ 3). The indictment does not address whether these three tests were certified by the physicians as medically necessary.

[3] DE#23:25 (¶ 11) (count 7); DE#23:26 (count 13).

§ 982(a)(7), as gross proceeds traceable to the commission of the health care fraud scheme," "pursuant to 18 U.S.C. § 981(a)(1)(C), as proceeds of the conspiracy to commit wire fraud," and "pursuant to 18 U.S.C. § 982(a)(1), as property involved in the money laundering offenses;" and that "[a]s of on or about February 25, 2022, the Subject Account had a balance of over approximately $818,230.30." DE#81:10-11.

On March 4, 2022, this Court signed the government's proposed, sealed restraining order and entered it on March 7, 2022. DE#103.

On April 8, 2022, Gosney filed a motion to vacate the restraining order asserting that the restrained Valley Bank account contained untainted funds needed to retain trial counsel of choice, attorney Howard Srebnick. DE#172 (citing *United States v. Monsanto*, 491 U.S. 600 (1989), *Kaley v. United States*, 571 U.S. 320 (2014) and *Luis v. United States*, 578 U.S. 5 (2016)). Gosney's motion exposed the flaws in, and limits to, the prosecution's theory that surfaced at the February 22, 2022, preliminary hearing of co-defendant Michael Rozenberg: FBI Agent Frank's testimony established that the approximately 3,700 cardiovascular tests submitted to Medicare for reimbursement were actually performed and ordered by the "managing care doctor[s] for the individual Medicare beneficiaries." DE#172:5 (citing DE#170:68–69, 72). And Agent Frank admitted that there was "no evidence of any [] inducement, anything of value coming from Progenix to the PCP doctors," DE#170:70-71, or to their patients (*i.e.*, the Medicare beneficiaries). DE#170:70.

Challenging the breadth of the government's restraint as against the entirety of the Valley Bank account, Gosney's motion (DE#172:5-7) cited three cases supporting his argument that Medicare revenues generated by the administration of lab testing ordered and certified as medically necessary by a patient's independent PCP does not constitute fraud proceeds subject to restraint:

7

- *United States ex rel. Groat v. Bos. Heart Diagnostics Corp.*, 296 F. Supp. 3d 155, 158 (D.D.C. 2017) ("[A] laboratory may rely on the ordering physician's determination of medical necessity.");

- *United States v. AseraCare, Inc.*, 938 F.3d 1278, 1296–98 (11th Cir. 2019) ("[W]hen a [Medicare] provider submits a claim that certifies [medical necessity] … the claim cannot be 'false'—and thus cannot trigger [False Claims Act] liability—if the underlying clinical judgment does not reflect an objective falsehood."); and

- *United States v. Medina*, 485 F.3d 1291, 1304 (11th Cir. 2007) ("Even though [a witness] testified that Medicare would not pay a claim if they knew parties were receiving kickbacks, this is not sufficient to establish a loss to Medicare.").

Gosney's motion acknowledged the testimony that employees of the related entities engaged in (immaterial) deceptive practices to convince patients to seek their own PCP's approval to have the tests administered, including telling "lies to beneficiaries in order to convince the beneficiaries to provide their Medicare numbers, which was necessary for the laboratories to bill Medicare." DE#172:6 (quoting DE#81:6(¶17)). To that inducement claim, Gosney's motion cited *United States v. Takhalov*, 827 F.3d 1307, 1313 (11th Cir. 2016) ("[A] schemer who tricks someone to enter into a transaction has not 'schemed to defraud' so long as he does not intend to harm the person he intends to trick. And this is so even if the transaction would not have occurred but for the trick. For if there is no intent to harm, there can only be a scheme *to deceive*, but not one *to defraud*.") (emphases in original). Neither the indictment nor the testimony presented at the preliminary hearing alleged that the labs deceived the patients' own, independent PCPs through "false marketing statements regarding the medical necessity of its tests." *Compare United States ex rel. Groat*, 296 F. Supp. 3d at 165 (alleging "a scheme to encourage non-cardiology

8

physicians to order medically unnecessary tests through a false marketing campaign and pre-printed test requisition forms").

On June 10, 2022, after receiving further briefing from the parties, this Court entered a 12-page order, outlining the procedural history of the case and comprehensively addressing the arguments of the parties. DE#256. This Court denied Gosney's motion to vacate on the grounds that:

- Gosney's scheduled trial date in January 2023 was constitutionally adequate to be his first opportunity to contest the restraints, DE#256:7; and
- "Gosney's arguments on the merits all reduce to a claim that neither he nor his co-defendants committed the charged crimes or obtained any significant amount of money from improper Medicare claims. That determination, however, falls within the sole province of the grand jury under the Supreme Court's binding decision in *Kaley*." DE#256:11.[4]

---

[4] This Court wrote:

> Gosney's challenge to the asset restraint in this case amounts essentially to a frontal assault on the reliability and competence of the factual allegations supporting the Medicare fraud as alleged in the indictment [*see* ECF No. 172 pp. 4-7; ECF No. 205 p. 2]. Gosney relies heavily, for example, on what he considers to be revelations about the absence of fraud as drawn from the testimony of FBI Agent Frank at co-defendant Michael Rozenberg's preliminary hearing [ECF No. 172 pp. 4–7]. According to Gosney, Agent Frank's testimony establishes that roughly 3,700 medical tests at issue in at least part of the alleged fraud were properly "authorized by different treating physicians exercising their independent medical judgment regarding medical necessity" [ECF No. 172 p. 5]. Yet the indictment specifically and repeatedly alleges that Defendants, including Gosney, conspired to and did submit millions of dollars in false and fraudulent claims for medically unnecessary tests [ECF No. 23]. Gosney further argues, again citing to Agent Frank's testimony, that "neither doctors nor patients were paid kickbacks or otherwise unlawfully induced to order or receive

Gosney arranged for undersigned attorney Alyssa Silvaggi to timely file an appearance as trial counsel, while reserving his right to pursue an appeal from the denial of his motion to vacate the *ex parte* restraining order insofar as it deprives him of the financial ability to retain trial counsel of choice. DE#269. Gosney timely filed a notice of appeal. DE#258. Without seeking any extensions, the parties timely filed their respective briefs and are awaiting word on whether the court of appeals will hear argument or rule on the papers. *See* 11th Cir. Appeal No. 22-12049-CC.

## ARGUMENT

The Government is pursuing a legally flawed theory of prosecution. During the Rozenberg preliminary hearing, FBI Agent Frank's testimony established that: approximately 3,700 cardiovascular tests were submitted to Medicare for reimbursement; "the 3700 tests…were in fact performed"; and each test was ordered by the "managing care doctor[s] for the individual Medicare beneficiaries." DE#170:68–69, 72. The lab owners could rely on the ordering physician's independent medical judgment in determining that the cardiovascular tests were

---

unnecessary [medical] tests" [ECF No. 172 p. 5]. Yet again the indictment alleges otherwise, claiming that the conspiracy involved kickback and bribe arrangements with health care providers, companies, and laboratories [ECF No. 23 pp. 14, 21]. In the same vein, Gosney urges that any lies allegedly made by Defendants to induce others to perform these tests cannot form the basis of a "scheme to defraud" under the Eleventh Circuit's decision in *Takhalov*, 827 F.3d at 1313, but that too is inextricably premised upon a challenge to the reliability and foundation of the charged offenses for which the grand jury found probable cause [ECF No. 172 p. 6]. Finally, in Reply, Gosney again focuses on the substance and extent of the fraud, arguing that any revenue derived from just a few irregular Medicare billings represents a "small fraction" of the revenue from the 3,700 otherwise proper tests [ECF No. 205 p. 3].

DE#256:10.

medically necessary. *Id. at* 72:18–23; *see United States ex rel. Groat*, 296 F. Supp. 3d at 159 ("[T]he Court is now convinced that a laboratory cannot and is not required to determine medical necessity, but rather is permitted to rely on the ordering physician's determination that the laboratory tests billed to Medicare are medically necessary."). FBI Agent Frank's testimony also established that neither doctors nor patients were paid kickbacks or other inducements to order or receive unnecessary cardiovascular tests. DE#170:70–71.

To be sure, the indictment alleges deceptive practices to convince patients to seek Medicare approval to take the test, including telling "lies to beneficiaries in order to convince the beneficiaries to provide their Medicare numbers, which was necessary for the laboratories to bill Medicare." DE#81:6(¶17). But the federal fraud statutes do not criminalize all forms of deception; only those schemes designed to deprive the victim of the bargained-for services are prosecutable fraud offenses.[5] *United States v. Takhalov*, 827 F.3d 1307, 1313 (11th Cir. 2016) ("[A] schemer who tricks someone to enter into a transaction has not 'schemed to defraud' so long as he does not intend to harm the person he intends to trick. And this is so even if the transaction would not have occurred but for the trick. For if there is no intent to harm, there can only be a scheme *to deceive*, but not one *to defraud*.") (emphases in original).[6] And the money laundering charge depends entirely on the Government first establishing the completion of the fraud that generated the illegal

---

[5] Count One alleges a conspiracy to commit health care "fraud and wire fraud." DE#23:12.

[6] In *Takhalov*, for example, bars hired "Bar girls" to trick businessmen into frequenting their bars to order drinks, but this did not constitute fraud because "the businessman got exactly what he bargained for." *Id*. at 1313. Here, the value of, need for, and order of, the medical services was determined by the requesting physicians—the only persons Medicare considers eligible to make such decisions. 42 U.S.C. § 1395n(a)(2).

11


proceeds. *United States v. Christo*, 129 F.3d 578, 579–80 (11th Cir. 1997) ("The main issue in a money laundering charge, therefore, is determining when the predicate crime becomes a 'completed offense' after which money laundering can occur.").

Significantly, because the government does ***not*** allege that any of the thousands of treating physicians who approved the testing for their own patients based on those physicians' medical judgments were paid kickbacks or were somehow corrupted, the patients were otherwise eligible to have Medicare pay for the tests. Thus, the revenues generated by the doctor-ordered, medically necessary genetic testing do not constitute proceeds of a fraud. *See AseraCare, Inc.*, 938 F.3d at 1296–98 ("It follows that when a [Medicare] provider submits a claim that certifies [medical necessity] 'based on the physician's or medical director's clinical judgment regarding the normal course of the individual's illness,' 42 U.S.C. § 1395f(7), 42 C.F.R. § 418.22(b), the claim cannot be 'false'—and thus cannot trigger [False Claims Act] liability—if the underlying clinical judgment does not reflect an objective falsehood."); *cf. Bodie v. Purdue Pharma Co.*, 236 F. App'x 511, 518–19 (11th Cir. 2007) (describing the "learned intermediary" doctrine as "destroying the causal link" between the patient and manufacturer of a prescription drug for failure to warn of risks associated with the drug because the physician prescribing the medication acts as a "learned intermediary.").

Payment by Medicare for medically necessary services rendered does not cause loss to Medicare. *See Medina*, 485 F.3d at 1304 ("There was no evidence presented that these claims were not medically necessary. Even though [a witness]

testified that Medicare would not pay a claim if they knew parties were receiving kickbacks, this is not sufficient to establish a loss to Medicare.").[7]

Billings for providing medically necessary services are not a proper subject of criminal punishment, and Congress could not so intend. *United States v. Bane*, 720 F.3d 818, 828 (11th Cir. 2013) ("We therefore hold that the district court erred when it failed to exclude the value of medically necessary goods victims actually received from its restitution calculation.").

Critically, the lack of any evidence impeaching any medical certification leads to the opposite conclusion—that the vast majority of tests were properly doctor-certified. Even if some unidentified tests were suspect, neither the indictment nor the declaration in support of the Government's *ex parte* motion purport to quantify the Medicare payments to the related entities for medically unnecessary testing, *i.e.*, payments not authorized by the patient's treating physician, *e.g.*, forged doctor's orders.

To be sure, the Government proffered, and the indictment alleges, Medicare revenues generated by a "handful" of forged prescriptions. Gosney was excluded from the list of defendants named in the overt act alleging "altered, forged, or back dated doctors' orders, or caused such doctors' orders to be altered, forged or backdated, for DME and genetic testing." DE#23:15 (¶7).

---

[7] The government alleged that the defendants violated the so-called "Shell Lab Rule," DE#81:7–8(¶23), which limits to 30 percent "during the year in which the test is performed" the number of tests that a laboratory can "reference out." 42 U.S.C. § 1395l(h)(5)(A)(ii)(III). But defendants disclosed to Medicare that the tests were being referenced out. DE#170:17. And defendants operated the business for approximately six months, so no "Shell Lab Rule" violation could have occurred. Nor would any violation of the yearly referral limits of the "Shell Lab Rule" cause a loss to Medicare, so long as the billed-for test was medically necessary and actually performed. *See Medina*, 485 F.3d at 1304.

The indictment alleges, as a precondition to Medicare payment, treating doctors were "required to certify" that: (1) claim form contents are true; (2) the forms comply with Medicare regulations; and (3) "the services that were purportedly provided, as set forth in the claims, were medically necessary." DE#23:3 ¶7. Medicare requires diagnostic testing be ordered by a patient's treating physician or eligible equivalent. 42 C.F.R. § 410.32(a*). See Willowood of Great Barrington, Inc. v. Sebelius*, 638 F. Supp. 2d 98, 112 (D. Mass. 2009) (upholding diverse testing standards of regional Medicare administrators).

The indictment further alleges that coverage for medical testing is limited to diagnosis or treatment of certain medical conditions but not others, with other testing diagnostic purposes perhaps having to meet other standards for coverage. DE#23:5 ¶¶16, 17. By law, the only person authorized to implement this labyrinth of payment preconditions for medical testing services is the treating doctor who orders the test and must certify his diagnostic needs directly to Medicare. Only doctors know the purpose for which they order diagnostic testing, so only they have a factual basis upon which to certify their purpose, their compliance and coverage.

Only about "roughly ten, maybe more" of the nearly 3,700 tests at issue were not supported by a valid doctor's order. DE#170:99-100. And for this very small percentage of purportedly invalid doctor's orders, the indictment does not allege that Gosney was responsible for the limited forgery activity referenced at Rozenberg's preliminary hearing. DE#23:15, ¶7.

Further, of the more than 3,500 independent doctors who ordered tests for their patients, the Government only "interviewed a handful of them." *Id*. (citing DE#170:71-72). And the Government does ***not*** allege that any of the thousands of treating physicians who approved the testing for their own patients based on those physicians' medical judgments were paid kickbacks or were somehow corrupted. Thus, the revenues generated by the doctor-ordered, medically necessary genetic

14

testing do not constitute proceeds of a fraud. *See AseraCare, Inc.*, 938 F.3d at 1296-98 ("[Medicare] claim cannot be 'false'—and thus cannot trigger [False Claims Act] liability—if the underlying clinical judgment does not reflect an objective falsehood.").

Under the law of this Circuit, a doctor's medical certification of necessity is a clinical medical judgment that cannot be second-guessed other than by proving it is the product of an objective falsehood (*e.g.*, a forgery of an order). *Simon ex rel Florida Rehabilitation Associates v. Healthsouth of Sarasota L.P.*, 2022 WL 3910607, at *7 (11th Cir. August 31, 2022) (citing *AseraCare, Inc.*, 938 F.3d at 1296-98); *Bell v. Cross*, 2021 WL 5544685, *3 (11th Cir. Nov. 26, 2021) (citing *AseraCare*, affirming summary judgment for lack of objective falsity for certified patient treatment).

Where—as here—the decision to provide medical services is dependent upon an individual clinical medical judgment by a treating physician, courts have rejected statistical analyses of such patient-specific judgments. *United States v. Long Grove Manors*, 315 F. Supp. 3d 1107, 1117 (N.D. Ill. 2018) (citing *U.S. ex rel. Michaels v. Agape Senior Community, Inc.*, 2015 WL 3903675, at *7 (D.S.C. June 25, 2015)). Both the testing laboratory and Medicare can, and indeed must, rely upon a doctor's certification of medical necessity. *United States ex rel. Groat*, 296 F. Supp. 3d at 159 (following OIG Guidance, "a laboratory cannot and is not required to determine medical necessity, but rather is permitted to rely on the ordering physician's determination that the laboratory tests billed to Medicare are medically necessary."). A trial court should be able to do the same (*i.e.*, rely upon certified clinical judgments by ordering physicians), absent probable cause to believe that these certifications are objectively false.

Moreover, a properly asserted fraud count requires an allegation that "the party who allegedly was deceived . . . be the same as the party that is defrauded of

money or property by the . . . fraud scheme . . . ." *United States v. Seidling*, 737 F.3d 1155, 1160 (7th Cir. 2013). Medicare was not deceived, and the Government does not allege that the doctors' independent judgments of medical necessity were corrupted in any manner. Instead, the alleged deceptive practices were to convince patients to seek Medicare approval to take the tests, which bears no significance on whether the patients were otherwise eligible to have Medicare pay for the tests if they were medically necessary. *See Medina,* 485 F.3d at 1304 ("There was no evidence presented that these claims were not medically necessary. Even though [a witness] testified that Medicare would not pay a claim if they knew parties were receiving kickbacks, this is not sufficient to establish a loss to Medicare."). The party allegedly deceived (the patients) is not the same as the party allegedly defrauded (Medicare).

## CONCLUSION

For the foregoing reasons, Gosney moves to dismiss Counts 1, 4-6, 14, 15, 17, and 19 of the Indictment (the fraud and money laundering counts) and respectfully requests a hearing on this Motion.

Respectfully submitted,

**BLACK SREBNICK**
201 South Biscayne Boulevard, Suite 1300
Miami, Florida 33131
Tel. (305) 371-6421

/s/   *Alyssa Silvaggi*
**ALYSSA SILVAGGI, ESQ.**
Florida Bar No. 114129
E-mail: ASilvaggi@RoyBlack.com