UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-CR-80022-CANNON/REINHART

UNITED STATES OF AMERICA

vs.

THOMAS DOUGHERTY,
JOHN PAUL GOSNEY JR., and
JOSE GOYOS,

        **Defendants**.
_____/

## RENEWED MOTION TO AUTHORIZE FILTER TEAM TO RELEASE MATERIAL SUBJECT TO THE CRIME-FRAUD EXCEPTION

The government, by and through the prosecution team in this matter, respectfully moves this Court for an order authorizing the filter team to release to the government's prosecution team and to all defendants in this case certain communications with Attorneys Robyn Sztyndor, Keith Fousek, Aaron Cohen, and Paul Molle. The Court previously denied this Motion without prejudice and did not authorize the release of such materials prior to the July 10, 2023 trial of Defendant Daniel M. Carver ("D-CARVER"), Louis Carver ("L-CARVER"), and Jose Goyos ("GOYOS"). [ECF No. 656.] However, the Court permitted the government to file "any renewed motion tailored to specific privilege issues" by August 6, 2023. [ECF No. 737.]

On August 1, 2023, the Court (*McCabe*, M.J.) issued a report and recommendation [ECF No. 762] granting in part and denying in part the government's motion to preclude introduction of evidence or argument related to defendants' advice-of-counsel defense [ECF No. 589]. The Court ordered Defendants Thomas Dougherty ("DOUGHERTY") and John Paul Gosney Jr. ("GOSNEY") to decide whether they would assert an advice-of-counsel defense by August 10, 2023. [ECF No. 762 at 9–10.] Per this order, the defendants assertion of this defense would result

1

in a subject-matter waiver and a release of materials (including certain communications with Attorneys Fousek, Sztyndor, Cohen, and Molle, as described in the order). *Id*. The Court also found that, to the extent D. CARVER (or anyone else) seeks to maintain privilege assertions over any of this material, "such privilege must yield to DOUGHERTY's and GOSNEY's Sixth Amendment right to present a defense." *Id*.

As of the date of this filing, DOUGHERTY and GOSNEY have not yet indicated whether they will assert an advice-of-counsel defense, which may result in the Court authorizing release of much of (if not all) the same material sought in this Motion. In the event the defendants assert the defense, and such material is released pursuant to the subject-matter waiver accompanying the assertion of the advice-of-counsel defense, this Motion would be moot. However, in the event the material is not released pursuant to a waiver, the government seeks release of such materials under the crime-fraud exception to the attorney-client privilege.

Such a release is warranted under the crime-fraud exception to the attorney-client privilege and work-product doctrine. First, the government has made "a *prima facie* showing that the client was engaged in criminal or fraudulent conduct when he sought the advice of counsel, that he was planning such conduct when he sought the advice of counsel, or that he committed a crime or fraud subsequent to receiving the benefit of counsel's advice." *In re Grand Jury Subpoena*, 2 F.4th 1339, 1345 (11th Cir. 2021). The grand jury found probable cause that Defendants D-CARVER, DOUGHERTY, GOSNEY, L-CARVER, and GOYOS (collectively the "Defendants") committed the crimes alleged in the Superseding Indictment during the time period they communicated with counsel. [ECF No. 577].

Second, records in the prosecution team's possession and anticipated testimony of government witnesses establish that "the attorney's assistance was obtained in furtherance of the

criminal or fraudulent activity or was closely related to it." *In re Grand Jury Subpoena*, 2 F.4th at 1345. Specifically, this evidence shows that the Defendants used their communications with attorneys in furtherance of and to conceal their fraud by using the attorneys to: insert nominee owners of corporate entities; execute and file false records with Medicare; create and execute sham corporate and transactional records; create and execute sham contracts; and communicate with complainants (doctors and patients)—all of which was done either to conceal the participants' involvement in the scheme or to conceal and disguise the illegal nature of the scheme. As a result, this Court should issue an order finding that these communications and documents fit within the crime-fraud exception and issue an order authorizing the release of these materials and finding no privilege applies to these communications and documents.

## FACTUAL BACKGROUND

On February 24, 2022, a grand jury sitting in the Southern District of Florida returned an indictment charging, the Defendants, among others, with several crimes for their respective roles in health care fraud, wire fraud, kickback, and money laundering offenses. [ECF No. 23]. On May 25, 2023, a grand jury returned a nearly identical superseding indictment charging the Defendants with the same offenses. [ECF No. 577].

The Superseding Indictment alleges that the Defendants engaged in a two-phase health care fraud and wire fraud conspiracy that spanned approximately a year and a half, from in or around January 2020 through in or around July 2021.

The first phase, which occurred approximately between January 2020 and June 2020, involved a call center and marketing company called Broad Street Lifestyles, LLC ("BROAD STREET"), that D-CARVER and DOUGHERTY, along with co-conspirators Blake Fishman ("Fishman") and Zachary Nelson ("Nelson"), owned and controlled. BROAD STREET sold false

and fraudulent doctors' orders (deriving from forging doctors' signatures or paying kickbacks to telemedicine doctors) to durable medical equipment ("DME") companies, laboratories, and other marketers in exchange for kickbacks.  L-CARVER, GOYOS, and co-conspirator Ethan Macier ("Macier") all worked as managers at BROAD STREET or played other critical roles during this phase.  During this phase, BROAD STREET sold doctors' orders for DME to GOSNEY, who owned and operated DME and marketing companies.

In the summer of 2020, D-CARVER, DOUGHERTY, Fishman, and Nelson sought to partner in the acquisition of a laboratory in New Orleans from an entity to which BROAD STREET was selling doctors' orders.  However, in early July 2020, D-CARVER and DOUGHERTY pushed Fishman and Nelson out of the business, and, in turn, partnered with GOSNEY.  This began the second phase, which occurred from approximately June 2020 through approximately July 2021.  It was led by D-CARVER, DOUGHERTY, and GOSNEY.  This second phase involved D-CARVER, DOUGHERTY, GOSNEY, and co-conspirators, who jointly owned at least five shell laboratories that they used to bill Medicare over $67 million for laboratory services, almost exclusively for expensive and medically unnecessary genetic testing for cardiovascular diseases.  These shell laboratories included Cergena Laboratories, LLC ("CERGENA"), Progenix Lab, LLC ("PROGENIX"), Theragene Diagnostics, LLC ("THERAGENE"), Accugene, LLC ("ACCUGENE"), and Signify Laboratory, LLC ("SIGNIFY").[1]  Although D-CARVER, DOUGHERTY, and GOSNEY owned and controlled these shell labs, they concealed their ownership from Medicare by using nominee owners and submitting false Medicare enrollment forms.  Specifically, the Defendants inserted: (i) L-CARVER to act as nominee owner of

---

[1] During the conspiracy period, the conspirators did not submit claims to Medicare through either ACCUGENE or SIGNIFY.  However, as discussed below, they submitted, or caused the submission of, false enrollment records on behalf of ACCUGENE and SIGNIFY.

CERGENA, SIGNIFY, and THERAGENE; (ii) D-CARVER's mother to act as nominee owner of ACCUGENE; and, initially, listed only Galina Rozenberg as the owner of PROGENIX.

In addition to owning and controlling these shell laboratories, D-CARVER, DOUGHERTY, and GOSNEY operated a call center network using a handful of corporate entities, including Olympus First Consulting, LLC ("OLYMPUS"), DMC Group Holding, LLC ("DMC GROUP"), and Gentec Solutions, LLC ("GENTEC"). D-CARVER, DOUGHERTY, GOSNEY, and their co-conspirators generated doctors' orders to refer to each shell lab from their call center operations located in Broward and Palm Beach Counties, with a flagship location located in Boca Raton. These call centers included: (i) a team that called Medicare beneficiaries and induced them to provide their Medicare number, primary care physician ("PCP") information, and consent to genetic testing, which was done using deceitful sales scripts; (ii) a verification team that confirmed Medicare billing information for beneficiaries; (iii) a doctor chase team that also used deceit to obtain the PCP signatures after the beneficiary had consented; and (iv) a kit chase team that facilitated the shipment and administration of each test.

The doctor chase team in particular operated by sending a fax to the PCP or provider, on GENTEC letterhead, falsely stating that the beneficiary was a "mutual patient" and that the beneficiary requested the test. The team then hounded the physicians' offices, resulting in them successfully obtaining a signed requisition form around 20–30% of the time. Additionally, to generate more orders to bill Medicare, the Defendants and their co-conspirators forged doctors' signatures authorizing the tests, forged patient signatures consenting to the tests, and forged results from the tests. Once the Defendants and their co-conspirators had in hand the signed doctors' order and beneficiary DNA sample, they sent the sample to a reference lab in California that they paid to run a genetic test at the cost of approximately $400 per test. The shell labs—which over

the conspiracy never conducted a single test—then billed Medicare up to $10,000 per test. The shell labs' operations generated several complaints from beneficiaries and providers, some of which were communicated to the Defendants directly or through various employees.

In addition to processing claims through shell labs, D-CARVER, DOUGHERTY, and GOSNEY, along with co-conspirator Todd Shull ("Shull"), sold excess doctors' orders from the call center operation to a lab in Colorado in exchange for kickback payments totaling over $1,270,000. The conspirators executed a sham contract and issued sham invoices from a shell company Shull created. Shull then funneled the kickback payments to D-CARVER, DOUGHERTY, and GOSNEY, through their respective shell companies: MDA Consumers, Inc. ("MDA"); MC Mission, Inc. ("MC MISSION"); and Metropolis Unlimited, LLC ("METROPOLIS"). As set forth in Counts 7 through 13, D-CARVER, DOUGHERTY, and GOSNEY are charged with kickback offenses for their involvement in this aspect of the scheme.

The Defendants are also charged with conspiracy to commit money laundering for their respective roles in laundering fraud and kickback proceeds derived from both aspects of the scheme in violation of 18 U.S.C. § 1956(h). D-CARVER, DOUGHERTY, GOSNEY, and L-CARVER are also charged with substantive concealment money laundering counts, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and D-CARVER is charged with substantive counts of money laundering in violation of 18 U.S.C. § 1957. Some of these money laundering counts involve transfers of fraud proceeds from the shell labs to shell companies that were effectuated by D-CARVER, L-CARVER, DOUGHERTY, and GOSNEY. Other money laundering counts involve D-CARVER issuing bank checks from OLYMPUS's and CERGENA's accounts in amounts just under $25,000 to GOYOS, Macier, and others, which were taken to the back room of a check-

cashing store, where D-CARVER got cash and put it in duffle bags before giving each participant a few hundred dollars for allowing D-CARVER to use each of their names.

## LEGAL STANDARD

The attorney-client privilege encourages "full and frank communication between attorneys and their clients and thereby promote[s] broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). Protecting the privilege, however, comes at a significant cost to the truth-seeking function of the adversarial system. *United States v. Zolin*, 491 U.S. 554, 561-63 (1989). Accordingly, when a client abuses the system by consulting an attorney for the purpose of furthering criminal or fraudulent activity, the application of the attorney-client privilege is overcome by the "crime-fraud exception" and such information loses its protected status. *Id*; *see In re Grand Jury Investigation (Schroeder)*, 842 F.2d 1223, 1226 (11th Cir. 1987) ("The attorney-client privilege does not protect communications made in furtherance of a crime or fraud."). This exception also applies to materials for which the work product doctrine would otherwise apply. *In re Sealed Search Warrant*, 11 F.4th 1235, 1249 (11th Cir. 2021), *cert. denied sub nom. Korf v. United States*, 214 L. Ed. 2d 15, 143 S. Ct. 88 (2022).

When determining whether the exception applies, it is immaterial that the lawyer is innocent of any wrongful intent. "The privilege is the client's, so it is the client's knowledge and intentions that are of paramount concern to the application of the crime-fraud exception; the attorney need know nothing about the client's ongoing or planned illicit activity for the exception to apply." *D.O.T. Connectors, Inc. v. J.B. Nottingham & Co.*, No. 4:99CV311-WS, 2001 WL 34104927, at *1 (N.D. Fla. Jan. 23, 2001) (internal quotation and citation omitted). The exception therefore applies even where the attorney is unaware that his or her advice is sought in furtherance of an improper purpose. *In re Grand Jury Proceedings*, 517 F.2d 666 (5th Cir. 1975).

Courts apply a two-part test to determine whether the crime-fraud exception applies: (1) "there must be a *prima facie* showing that the client was engaged in criminal or fraudulent conduct when he sought the advice of counsel, that he was planning such conduct when he sought the advice of counsel, or that he committed a crime or fraud subsequent to receiving the benefit of counsel's advice . . ." and (2) "there must be a showing that the attorney's assistance was obtained in furtherance of the criminal or fraudulent activity or was closely related to it." *In re Grand Jury Subpoena*, 2 F.4th 1339, 1345 (11th Cir. 2021); *see Zolin*, 491 U.S. 554. The exception may be applied to disclose materials that reveal the existence of the crime "as well as efforts to conceal it." *JTR Ents. v. Columbian Emeralds*, 697 F. App'x 976, 988 (11th Cir. 2017).

The *prima facie* standard "is satisfied by a showing of evidence that, if believed by a trier of fact, would establish the elements of some violation that was ongoing or about to be committed." *Schroeder*, 842 F.2d at 1226. This *prima facie* showing need not rise to the level of proof necessary to show that a defendant is guilty of the crime charged.[2] Once established, the burden of persuasion shifts to the privilege holder to rebut the *prima facie* showing that has been made. *Gutter v. E.I. Dupont De Nemours*, 124 F.Supp.2d 1291, 1307 (S.D. Fla. 2000).

---

[2] *See In re Grand Jury Subpoena*, 220 F.3d 406, 410 (5th Cir. 2000) (holding that the crime-fraud exception applied and stating that "[w]hile the targets of this investigation may have valid defenses that preclude indictment or conviction for fraud or criminal environmental violations, the existence of a potential defense does not mean that the district court reversibly erred."); *United States v. Cleveland*, No. Crim. A. 96-207, 1997 WL 232538, at *4 (E.D. La. May 8, 1997) ("A finding that the Government has made a *prima facie* showing that the relationship between attorney and client was intended to further illegal activity is not tantamount to a finding that the defendant is guilty."); *In re Feldberg*, 862 F.2d 622, 626 (7th Cir. 1988) (holding that the standard for the *prima facie* showing "is not whether the evidence supports a verdict but whether it calls for inquiry.").

## ARGUMENT

### A. The Defendants and their Co-Conspirators Intended to Commit a Fraud or Crime When They Consulted Counsel.

As noted above, the first prong of the two-part crime-fraud test is "satisfied by a showing of evidence that, if believed by a trier of fact, would establish the elements of some violation that was ongoing or about to be committed." *Schroeder*, 842 F.2d at 1226. In other words, the moving party "must provide evidence, which has some foundation in fact, that would establish elements of some violation that was ongoing or about to happen." *United States v. Esformes*, No. 16-20549-CR, 2018 WL 5919517, at *14 (S.D. Fla. Nov. 13, 2018). When an action can be "reasonably construed" to be a criminal violation, the first part of the test is satisfied. *United States v. Mitchell*, No. 3:11-CR-248(S1)-J-34, 2013 WL 3808152, at *26 (M.D. Fla. July 22, 2013). Even prior to indictment, this standard presents a "low hurdle." *See In re Grand Jury Subpoena*, 2 F.4th at 1345 ("Rather, this *prima facie* showing must only 'have some foundation in fact,' and although 'mere allegations of criminality are insufficient,' the government may meet its burden by providing 'a good faith statement ... as to what evidence is before the grand jury.'" (quoting *Schroeder*, 842 F.2d at 1226)).

Here, the grand jury has already determined, based on the evidence before it, that there is probable cause that the Defendants engaged in fraud, kickback, and money laundering offenses at the time they sought assistance from Attorneys Sztyndor, Fousek, Cohen, and Molle.[3] At this stage of the case, therefore, the Court can rely on the finding made by the grand jury when it returned the Superseding Indictment that fully describes the fraud scheme at issue, as crimes alleged in an

---

[3] During the timeframe of the conspiracy alleged in the Superseding Indictment, D-CARVER and DOUGHERTY also consulted with Attorney Molle. Although the prosecution team does not have access to Molle's communications with the defendant, the privilege logs suggest that they consulted Molle regarding health care matters pertinent to the criminal enterprise alleged in the Superseding Indictment.

9

indictment may serve as the "crime" within the "crime-fraud" exception. *See United States v. Stein*, 2023 U.S. Dist. LEXIS 47808 at *13; 2023 WL 2585033 (S.D. Fla. Mar. 21, 2023) (holding that "for crime-fraud purposes, an 'indictment provides a reasonable basis to believe that [a defendant] was engaged in criminal or fraudulent activity.'") (quoting *United States v. Gorski*, 807 F.3d 451, 461 (1st Cir. 2015)).

The charges in the Superseding Indictment therefore satisfy the first prong of the crime-fraud analysis—that the Defendants were engaged in (or were planning) criminal or fraudulent activity. And the government is only requesting that the Court apply the crime-fraud exception to communications or documents exchanged during the conspiracy period, which runs from January 2020 through July 2021. [ECF No. 577]. The Superseding Indictment and evidence discussed above thus establish a *prima facie* case that the Defendants were engaged, or planning to engage, in criminal or fraudulent conduct when the communications at issue occurred or the documents at issue were generated.

### B. The Defendants and their Co-Conspirators Used Attorney-Client Communications to Further and Conceal the Fraud.

To meet the second prong of the *prima facie* crime-fraud standard, the government must show that the relevant communication is "related to" the criminal or fraudulent activity established under the first prong. *Schroeder,* 842 F.2d at 1227; *see also United States v. Esformes*, No. 16-20549-CR, 2018 WL 5919517, at *14 (S.D. Fla. Nov. 13, 2018); *United States v. Cleckler*, 265 F. App'x 850, 853 (11th Cir. 2008); *In re Grand Jury*, 845 F.2d 896, 898 (11th Cir. 1988). Here, the communications at issue directly relate to the criminal conduct; indeed, they involve the drafting and editing of sham agreements intended to further and conceal the scheme, and they demonstrate a concerted effort to conceal the fraudulent scheme from others using the assistance of counsel. The Eleventh Circuit's opinion in *United States v. Cleckler*, 265 Fed. Appx. 850 (11th Cir. 2008),

provides an illustrative example of when a communication is "related to" criminal or fraudulent activity. In *Cleckler*, the Eleventh Circuit upheld a district court's crime-fraud determination where a defendant submitted fabricated documents through counsel to the IRS pursuant to counsel's effort to produce documents as part of an IRS appeal. 265 Fed. Appx. at 853-854. The Eleventh Circuit found that the communications at issue were related to the fraudulent activity, as the defendant obtained counsel's assistance to further his fraudulent activity and used counsel to provide additional fabricated documents to the IRS agent in an effort to conceal his crime. *Id.* Notably, the Eleventh Circuit did not need to engage in any analysis that the defendant's attorney had to be aware that the documents were fabricated for the crime-fraud exception to apply.

Here, similar to the facts in *Clerkler*, the Defendants—mostly through D-CARVER, DOUGHERTY, and GOSNEY—used the assistance of four attorneys (Aaron Cohen, Robyn Sztyndor, Keith Fousek, and Paul Molle) "in furtherance of the criminal or fraudulent activity," and the assistance of these attorneys was "closely related" to the criminal or fraudulent conduct. Most notably, based on a review of privilege logs and information provided by witnesses, the Defendants used these attorneys to (i) create GENTEC, a sham corporation and front company, (ii) create and execute sham corporate records and transactional records, (iii) provide the veneer of legitimacy to their otherwise illegal and illegitimate call center operations, (iv) respond to complaints accusing the defendants' "companies" of fraud; and (v) create and execute sham marketing agreements and other contracts. Some specific examples are set forth below:

1. **Cergena – False Corporate and Medicare Records**. D-CARVER, DOUGHERTY, and GOSNEY partnered in owning and controlling CERGENA. However, they concealed their ownership of the laboratory. To do so, they inserted L-CARVER as a nominee owner, created and executed sham corporate records for CERGENA, created a shell company in the name of L-CARVER (Louis C. Management, LLC)—which was the entity listed as the "owner" of CERGENA—executed false enrollment records with Medicare, and created and executed sham transactional records to make it appear L-CARVER,

11

through Louis C. Management, LLC, purchased CERGENA. During this process, they received assistance from attorneys. For example, on November 9, 2020, Attorney Sztyndor was listed as a contact for the seller in an Asset Purchase Agreement between CERGENA and MB Lab Ventures, LLC. **Exhibit 1A** (54326–37).[4] Also, on November 20, 2020, D-CARVER exchanged an email with Attorney Cohen with the subject "Fwd: Investment Agreement for Cergena." **Exhibit 2** (71944). Additionally, Attorney Cohen purportedly drafted "Marketing Agreements" between CERGENA and entities owned and controlled by D-CARVER (MDA CONSUMERS) and DOUGHERTY (MC MISSION). *Id.* (72063–71, 72072–80).[5]

2. **Sham Contracts.** DOUGHERTY received over $6.4 million in proceeds that flowed from Medicare through the shell laboratories and on to entities DOUGHERTY owned and controlled, such as OLYMPUS, and, ultimately, to MC MISSION. D-CARVER received over $7.1 million in proceeds that also flowed through the shell labs before ultimately ending up at MDA CONSUMERS. GOSNEY received over $7 million in proceeds that flowed in a similar manner, and, ultimately most of which was transferred to METROPOLIS. On or about October 15, 2020, Attorney Cohen drafted a sham Marketing Services Agreement between OLYMPUS and METROPOLIS. *See* **Exhibit 1A** (57041–49). Also, on or about November 24, 2020, D-CARVER and DOUGHERTY used the assistance of Attorney Cohen to create sham marketing contracts between OLYMPUS FIRST and MC MISSION and MDA CONSUMERS. *See* **Exhibit 2** (72062–80). These agreements—to the extent they were actually executed—were created to further conceal the common ownership and control D-CARVER, DOUGHERTY, and GOSNEY had over the shell laboratories and the entities that operated their call center network (OLYMPUS and DMC GROUP) and also to disguise the true nature of the financial transactions between OLYMPUS and MDA CONSUMERS-MC MISSION-METROPOLIS, entities used to conceal and launder proceeds.

3. **Front Company – Gentec Solutions.** The Defendants created a front company, GENTEC, to further their scheme and to insulate their other companies from the fraudulent activity of the call center and the laboratories. According to corporate records, GENTEC was solely owned and controlled by Ethan Macier. However, Mr. Macier is anticipated to testify that he had no idea that GENTEC was created in his name and that he did not find out that D-CARVER, DOUGHERTY, and GOSNEY used his name until months after the corporate entity was created. He will also testify that GENTEC was a front, and it was used to make the call center operations appear legitimate to medical providers. According to corporate records filed with the Florida Secretary of State, on February 17, 2021, GENTEC filed Articles of Incorporation listing Mr. Macier as the manager of

---

[4] When citing to the Defendants' privilege logs (**Exhibits 1A-1B** (GOSNEY), **Exhibit 2** (D-CARVER) and **Exhibit 3** (DOUGHERTY), the government cites to the SMU PPM bates stamp number on the log).

[5] GOSNEY asserted privilege over ten documents that explicitly reference "CERGENA." **Exhibit 1A** (list); **Exhibit 1B** (84542–45).

the entity. *See* **Exhibit 4 (GX514)**. The articles list Attorney Fousek as the registered agent for the company. *Id*.

4. **False Enrollment Records – Signify.** The Defendants owned and controlled SIGNIFY, an independent clinical laboratory enrolled with Medicare. In 2021, the Defendants sought to use the laboratory to bill Medicare for expensive cardiovascular genetic tests just as they used CERGENA, PROGENIX, and THERAGENE. Similar to CERGENA, the Defendants sought to insert a nominee owner of SIGNIFY in an effort to conceal their ownership and control from Medicare. In doing so, the Defendants executed sham corporate records listing L-CARVER as the corporate officer of SIGNIFY, executed false Medicare enrollment records, and created sham transactional records to make it appear as if L-CARVER purchased SIGNIFY. In July 2021, the Defendants obtained the assistance of Attorney Fousek related to a purchase agreement. *See* **Exhibit 2 (**52299). Earlier, on or about November 9, 2020, Attorney Sztyndor was listed as a representative of the "seller" in the sham Purchase and Sale Agreement transferring ownership of SIGNIFY from Parish Scientific, LLC to Louis C. Management, LLC (L-CARVER). **Exhibit 5** at ¶ 11 (Purchase Agreement)**.**

5. **Responding to a Complaint from a Doctor.** On April 23, 2021, Attorney Keith Fousek issued a letter, on GENTEC letterhead as "corporate counsel." *See* **Exhibit 6A, 6B**. He was responding to a complaint from a doctor, who alleged that he (the doctor) did not authorize the ordering of a genetic test for his patient and did not sign the requisition order. GOYOS and cooperating witness Ashley Cigarroa forwarded the complaint to Attorney Fousek for response. *Id*. In the letter, Attorney Fousek falsely stated that, "[GENTEC] is a document followup facility. We are only provided enough details about the patient and the doctors, to follow up on documentation and nothing more." *Id*. In truth, GENTEC was a front company, and the call center operation that sent the requisition form to the doctor is not a "document followup facility." It was a call center. The Defendants designed and managed a telemarketing campaign that lied to and tricked patients and doctors. They also directed employees to forge doctors' and patients' signatures in an effort to create paperwork (with an appearance of legitimacy) that they used to bill medically unnecessary genetic tests to Medicare. The Defendants used Attorney Fousek's assistance to respond to the doctor's complaint in an effort to make GENTEC appear legitimate and to quell the doctor's concerns that GENTEC was involved in fraud by having Attorney Fousek falsely describe GENTEC's conduct.

6. **Responding to Complaints from Patients**. According to records obtained during the search of the call center, Attorney Fousek, purportedly acting as counsel for PROGENIX, corresponded with patients in response to allegations that PROGENIX was committing fraud. On or about June 8, 2021, Attorney Fousek issued letters to beneficiaries that appear to have complained about

13

fraudulent activity involving PROGENIX. The letters are form letters and an example is attached as **Exhibit 7**. The letter contains the following excepts:

> *I am corporate counsel for Progenix Lab, LLC. I am writing personally to assure you that the test which was the subject of your letter was not fraudulent.*
>
> *. . .*
>
> *Every test that is sent out, is requested by the patient.*
>
> *. . .*
>
> *It is unfortunate that there are companies that are committing fraud. However, our company is not one of them. When Medicare lumps our company in with those fraudulent companies, it is unfortunate.*
>
> *. . .*
>
> *When a test like this is ordered, it is ultimately your doctor who makes the determination that a test is necessary and appropriate for a particular patient. In this case your doctor did authorize the test, but that could simply be a matter of them being busy and not paying attention . . . . The cases where fraud is involved, is where the company bypasses your doctor and charge (sic) Medicare for the testing.*
>
> *Medicare agent you spoke with may simply not understand the difference and just lump our company in with fraudulent companies. There are many reputable companies out there that, like us, must deal with the blowback from these unscrupulous companies. That is why I take the time to write these letters, so that you can sleep better knowing that you are not being defrauded.*

**Exhibit 7.**

7. **Sham Transactional Records Involving Laboratory Ownership (DMC GROUP, PROGENIX, ACCUGENE).** From March 2021 through June 2021, the Defendants obtained the assistance of Attorney Keith Fousek to draft sham transactional records for purported asset sales involving DMC GROUP, ACCUGENE, and PROGENIX. For example, on or about March 31, 2021, Ethan Macier executed two separate Asset Purchase Agreements purportedly (i) purchasing ACCUGENE for $10,000, on behalf of DMC GROUP, from nominee owner J.C. (D-CARVER's mother), and (ii) purchasing PROGENIX for $10,000, on behalf of DMC GROUP, from PROGENIX's only listed owner, G-ROZENBERG. **Exhibits 8, 9**. Mr. Macier also executed a sham bill of sale as well as a "Members Percentage Interests" document that falsely stated he was

60.3% owner of DMC GROUP and that D-CARVER, DOUGHERTY, and GOSNEY (all felons) had a 4.9% interest—below what they believed was the threshold that otherwise would have required them to report their ownership to Medicare. **Exhibits 10, 11**. Mr. Macier will testify that D-CARVER called him into the office and asked him to sit with Attorney Fousek and sign a stack of documents. Mr. Macier will testify that he signed documents that Attorney Fousek presented to him for approximately an hour.[6]

8. **Letter to Arkansas Attorney General.** After the call center was searched by law enforcement, GOYOS used the assistance of Attorney Fousek on August 9, 2021, to respond to a complaint from the Office of the Arkansas Attorney General. **Exhibit 12A, 12B**. In responding, Attorney Fousek used GENTEC letterhead listing him as "Corporate Counsel" and responded with demonstrable lies (some of which are set forth below):

*Our company policy is that we do not cold call anyone. If someone is called by this company, one they either signed up to be called at some type of health fair or other event wherein a table is set up with information about the testing and they are interested in have (sic) the test done and signup with their contact information so we call them back. Or as the complaint said they clicked on our website to be contacted.*

. . .

*There is no hard selling in these cases or cold calling . . . There is no scam here. We are not registered in some Caribbean Country, but in Florida.*

**Exhibit 12B**.

Additionally, D-CARVER and DOUGHERTY used the assistance of Attorney Cohen related to their operation of their "marketing" companies used to generate the fraudulent doctors' orders. *See, e.g.,* **Exhibit 2** (89847) ("Dissolve B[r]oad Street"); 89771 ("OFC LLC Op. Agreement"); (93022) ("Carver/TD employ. Agmt").[7]

Accordingly, the second prong of the crime-fraud standard is met.

---

[6] There are a number of other examples of the sham corporate and transactional records that the Defendants used the assistance of Attorney Fousek to draft and execute. *See also* **Exhibit 10A** (ACCUGENE Bill of Sale); **Exhibit 10B** (set of sham corporate records related to PROGENIX and ACCUGENE); **Exhibit 10C** (Asset Purchase Agreement for PROGENIX purportedly between DOUGHERTY and G-ROZENBERG); **Exhibit 10D** (Asset Purchase Agreement for ACCUGENE purportedly between DOUGHERTY and D-CARVER's mother).

[7] Throughout the scheme, D-CARVER, DOUGHERTY, and GOSNEY used three separate "marketing" companies to receive funds from the fraud scheme and to pay employees, overhead, and transfer fraud proceeds through these companies and onto entities they owned and controlled—BROAD STREET, OLYMPUS, and DMC GROUP.

## CONCLUSION

The evidence in this case establishes an ample basis to find that the Defendants and their co-conspirators intended to, and did, use the services of counsel to foster, further, and conceal a criminal scheme. *United States v. Ballard*, 779 F.2d 287, 292 (5th Cir. 1986) (The privilege ceases "when the lawyer becomes either the accomplice or the unwitting tool in a continuing or planned wrongful act."); *see Clark v. United States*, 289 U.S. 1, 15 (1933) ("A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law. He must let the truth be told."). For the reasons set forth above, the government respectfully requests that the Court issue an order authorizing the release of all documents and communications the Defendants and their co-conspirators exchanged with Attorneys Sztyndor, Fousek, Cohen, and Molle or any other documents or communications involving these attorneys that the Defendants have asserted privilege over, as they are subject to the crime-fraud exception to the attorney-client privilege and work-product doctrine.

Dated: August 6, 2023

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

GLENN S. LEON, CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

By:  */s/ Patrick J. Queenan*
Patrick J. Queenan
FL Special Bar No. A5502715
Reginald Cuyler Jr.
FL Bar # 0114062
Andrew Tamayo
FL Special Bar No. A5502970
Trial Attorneys
U.S. Department of Justice
Criminal Division, Fraud Section

        1400 New York Avenue, N.W.
        Washington, D.C. 20005
        Phone: (202) 875-0326
        patrick.queenan@usdoj.gov
        reginald.cuyler.jr@usdoj.gov
        andrew.tamayo@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 6, 2023, I served and filed the foregoing document with the Clerk of the Court via CM/ECF.

        By:    */s/ Patrick J. Queenan*
                   Patrick J. Queenan
                   Trial Attorney
                   U.S. Department of Justice